Charles Glidden Osborne, Petitioner v. Commissioner.
Osborne v. Commissioner
Docket No. 56176.
United States Tax Court
T.C. Memo 1957-199; 1957 Tax Ct. Memo LEXIS 51; 16 T.C.M. (CCH) 905; T.C.M. (RIA) 57199; October 21, 1957
John P. Carroll, Jr., Esq., and David D. Brown, III, Esq., for the petitioner. A. Jesse Duke, Jr., Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in the income tax of petitioner as follows: Year
Amount
1944
$ 4,925.68
1945
4,713.72
1946
4,191.68
1947
2,049.30
1948
1,531.90
1949
2,077.87
Total
$19,490.15
The issues are whether respondent erred in determining that petitioner, during the above taxable years, received distributable income from *52 a trust created by the will of his deceased wife in excess of that reported by him, and if such determination was correct, whether petitioner is in that case entitled to certain deductions against such additional income. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner is an American citizen presently residing in England. He was born in Boston, Massachusetts, on February 9, 1884. His individual United States income tax returns for the calendar years 1944 to 1949, inclusive, were filed with the then collector of internal revenue for the second district of New York. On August 20, 1924, petitioner married May Peabody Osborne (hereinafter sometimes called "May"), a citizen of the United States domiciled in Illinois. At that time May had three daughters by a former marriage, as follows: Maiden Name
Year of Birth
May Henderson Stillwell
1915
Eleanor Stillwell
1917
Frances Stillwell
1920 One child, a daughter named Mahmea Enid Osborne (hereinafter called "Mahmea"), was born to May and petitioner on August 12, 1928. In February of 1927, May, petitioner and the three Stillwell girls took up residence on an estate called "Highfields" *53 in Marlow, Buckinghamshire, England. They continued to live there until May died testate on April 14, 1936, survived by petitioner and her four children. Petitioner thereafter continued to reside at Highfields until 1953. During the years here in controversy petitioner resided at Highfields with Mahmea. None of his stepdaughters resided with him during that period. The eldest of May's daughters had become estranged from her mother for undisclosed reasons, and petitioner's other two stepdaughters left Highfields in about May of 1939 for reasons which are not fully disclosed by the record. Highfields covered approximately 200 acres. The main house, stabling and pleasure gardens occupied 26 acres, 4 acres were wooded, and the rest consisted of farmland. The main residence contained a large hall, 5 reception rooms, 15 bedrooms, 2 dressing rooms, 6 bathrooms and domestic offices. It had central heating, an internal telephone system and utilities. Other residences on the grounds consisted of a 5-room lodge, a 6-room flat over the stables, a 5-room cottage, and three other residences known, respectively, as "Old Highfields," "Chalk Farm" and "Grey Clouds." Old Highfields had 2 reception *54 rooms, 7 bedrooms, 2 bathrooms, 2 lavato-&es and a k&tchen. Chalk Farm contained 3 bedrooms, dining room, sitting room and kitchen. Grey Clouds consisted of 2 living rooms, 4 bedrooms, bathroom, lavatory and kitchen. The estate also contained kennels, cow stables, 5 greenhouses, chicken houses and 2 garages. May left a last will and testament dated March 6, 1935, with a codicil thereto dated January 24, 1936. The foregoing instruments were admitted to probate in the State of New York on June 24, 1936, to ancillary probate in the State of Illinois on or about October 23, 1936, and were proved and registered in the Principal Probate Registry of His Majesty's High Court of Justice in London, England, on or about June 16, 1937. The foregoing last will and testament provided in part as follows: "FOURTH: Prior to our marriage, my beloved husband, Charles Glidden Osborne, insisted that neither he nor any of his family should at any time receive any part of my estate, and to effectuate this desire we entered into an ante-nuptial agreement. Nevertheless, as a slight indication of my love and esteem, I give and bequeath to my beloved husband, Charles Glidden Osborne, if he shall survive *55 me, the sum of One hundred thousand dollars ($100,000). * * *
"SEVENTH: ALL THE REST AND RESIDUE and remainder of my property (hereinafter called "my residuary trust fund") whether real, personal or mixed, of whatsoever character and wheresoever situate, of which I may die possessed or which I may own or have any interest in at the time of my death including property of which I may have any power of appointment by Will, and including any legacies under this my Will which may lapse, I give devise and bequeath to my trustees hereinafter named, to hold upon the following trusts: "(a) To set aside therefrom securities producing an income of approximately Twenty five thousand dollars ($25,000.00) per annum, and to invest and reinvest and keep invested the same and to pay the net income therefrom to my said husband during his life, requesting my said husband to use and dispose of the said income (but without imposing any trust) for the purpose of maintaining a family home for my husband and/or my children so long as my children or any of them shall desire that a family home shall be maintained. If and when, however, my husband shall decide in his best judgment that it is no longer *56 desirable or practical to maintain such a home and shall so advise his co-trustee in writing, or upon his death, then I direct that the securities so set aside shall thereafter form part of my residuary trust fund and the income and principal thereof shall be held by my trustees upon the trusts hereinafter declared in respect of the balance of my residuary trust fund. "(b) Subject as aforesaid, my trustees shall immediately after my death divide the principal of my residuary trust fund into as many equal shares as there shall be then surviving children of mine * * *. One such equal share shall be set apart and held by my trustees for and on behalf of each of such children of mine who shall then be living, * * *. The income from such equal share so set apart for a child of mine shall be disposed of by my trustees during the life of such child for whom such equal share is set apart as follows: My trustees shall, during the life of such child, pay the whole or any part of such income quarterly to such child or to his or her brothers and sisters or to any one or more of his or her brothers and sisters or to the Marlow Cottage Hospital, Marlow, Buckinghamshire, England, as my trustees *57 may in their absolute and uncontrolled discretion think fit. In exercising their discretion my trustees shall be guided by the decision of my said husband so long as he shall be living, in determining whether to pay the whole or any part of the income of such equal share to such child or to or among any one or more of his or her brothers and sisters or to the Marlow Cottage Hospital, and, in case of a division of such income, as to the amount of the several parts thereof, to be paid to the several beneficiaries and/or to the Marlow Cottage Hospital. In making this decision, it is my desire that my said husband shall have in mind the best interests for the time being of such child for whom such equal share is so set apart and of his or her brothers and sisters. * * * "(c) When any daughter of mine for whom an equal share is hereby set apart, attains the age of twenty-seven (27) years, my trustees shall pay to such daughter one-third of the principal of such equal share then held for her; and upon such daughter attaining the age of thirty-one years, my trustees shall pay to her one-half of the remainder of the principal of such equal share then held for her; and when any daughter for *58 whom an equal share is hereby set apart attains the age of thirty-five (35) years, my trustees shall pay and distribute to her all of the principal and accrued income of such equal share then held for such daughter by them. If however, my individual trustee named herein in his absolute discretion shall at any time deem it for the best interests of any daughter of mine that she shall receive a portion of the principal of such equal share at ages in advance of the ages hereinbefore provided, I authorise and empower my said trustees to pay to such daughter a portion of the principal of such equal share not more than two years in advance of the time or times designated for the respective payments of such portions including the final payment. Conversely, if my individual trustee in his absolute discretion shall at any time unanimously deem it for the best interests of any daughter of mine that she shall not receive a portion of the principal of her equal share until she has arrived at ages later than those set forth [above,] I authorise and empower my trustees to delay the payment to such daughter of any portion or portions of such equal share for such period or periods after the time *59 or times designated for the respective payment of such equal share or any portion thereof, including the final payment, as my individual trustee shall think fit. Provided always and further that if my former husband Addison Stillwell of Chicago, Illinois, shall at any time have interfered, or attempted to interfere, or shall at any time interfere or attempt to interfere with the education or upbringing or future life of movements of my daughters, or of any one or more of them, then my trustees shall have full power in their uncontrolled discretion to delay the payment to my said daughters or to any one or more of them, of any or all of the principal of their respective equal shares for so long as my trustees shall think fit. In exercising their discretion in this respect, my trustees shall be guided by the opinion of my individual trustee. * * *
"(h) So long as any beneficiary shall be a minor, my trustees shall retain his or her share until he or she attains the age of twenty-one (21) years, but my trustees may make payment out of the income or principal of such minor beneficiary's share to his or her guardian of such sum or sums from time to time as my trustees may think fit *60 for the proper education maintenance and support of such minor beneficiary, including such sum or sums as my trustees may think fit from time to time to supplement the provision which I have made by Clause seventh (a) of this my Will for the maintenance of a family home in the event that my trustees shall be of opinion that the income of $25,000 per annum which I have bequeathed for this purpose is at any time insufficient having regard to the mode of life to which my children are accustomed. The disbursement of any sum or sums out of the income or principal of any such minor beneficiary's share shall rest in the sole discretion of my trustees. "(i) The expression 'my trustees' shall mean my said husband and Guaranty Trust Company of New York acting jointly or on the death of my said husband Guaranty Trust Company of New York and Thomas J. Prindiville acting jointly and on the death of the survivor of my said husband and the said Thomas J. Prindiville Guaranty Trust Company of New York or its successors or assigns acting solely. The expression 'my individual trustee' shall mean my said husband or the said Thomas J. Prindiville as the case may be." The sole function of the codicil *61 was to substantially disinherit May's eldest daughter. Pursuant to the foregoing Article SEVENTH and under an agreement of compromise dated November 19, 1948 (hereinafter described), petitioner received sums out of the gross income of the estate as follows: Year
Amount
1944
$16,000.84
1945
16,904.23
1946
16,753.03
1947
17,246.14
1948
13,706.08
1949
19,574.33
During the years here in controversy all expenses of maintaining Highfields were borne by petitioner. Such expenses consumed, in each such year, more than the total amount received by him under the foregoing Article SEVENTH and compromise agreement. All amounts so received, as well as capital of his own, in amounts we are unable to determine from the record, were applied toward maintenance of Highfields. Relations deteriorated between petitioner and his step-daughters Eleanor and Frances, and, as above noted, they both left Highfields prior to 1944. Subsequently, controversies arose concerning, inter alia, the proper interpretations of various articles of the will and concerning the accountings and actions of petitioner as co-executor and co-trustee. The foregoing controversies were settled *62 by agreement dated November 19, 1948, and approved by the Surrogate pursuant to the laws of the State of New York. The agreement reads in part as follows: "WHEREAS, certain controversies have arisen among some of the parties hereto with respect, among other things, to the true meaning and effect of the Seventh Article of said Will and as to the propriety of certain payments to and actions taken by said Charles Glidden Osborne, including the matters and contentions more specifically referred to hereinafter, and "WHEREAS, Schedule L of the Executors' and Trustees' accounts as supplemented shows a total of $250,052.74 paid or due to Charles Glidden Osborne from April 14, 1936 through April 14, 1947 under the provisions of Article Seventh (a) of said Will, and "WHEREAS, the family home of said May Peabody Osborne, Charles Glidden Osborne, Eleanor A. Basso, Frances P. Salmon and Mahmea E. L. Osborne at and prior to the death of said May Peabody Osborne was the dwelling at 'Highfields', Marlow, Bucks, England, and said dwelling continued to be the family home of said Charles Glidden Osborne, Eleanor A. Basso, Frances P. Salmon and Mahmea E. L. Osborne after the death of said May Peabody *63 Osborne, and "WHEREAS, in or about the month of May, 1939, said Eleanor A. Basso and Frances P. Salmon removed from 'Highfields' and have not lived there since that time, and "WHEREAS, said Charles Glidden Osborne and Mahmea E. L. Osborne have continued to live at 'Highfields' and live there at the present time, and "WHEREAS, it is the contention of some of the parties hereto that said Charles Glidden Osborne influenced said Eleanor A. Basso and Frances P. Salmon to leave 'Highfields' in or about May, 1939, that said Charles Glidden Osborne has maintained no family home for and made no family home available to said Eleanor A. Basso and Frances P. Salmon since said time, that said Eleanor A. Basso and Frances P. Salmon have received no benefit from the income paid to or claimed by said Charles Glidden Osborne under said Article Seventh (a) as aforesaid, that some or all of said sum of $250,052.74 was improperly paid or should not be paid to said Charles Glidden Osborne, and that said Charles Glidden Osborne is not entitled to further payments of income under said Article Seventh (a), and "WHEREAS, it is the contention of other parties hereto that said sums were properly paid *64 to said Charles Glidden Osborne and that said Charles Glidden Osborne is entitled to the income specified in Article Seventh (a) of the Will free from any duty to maintain a family home or other fiduciary obligation throughout his life and will continue to be so entitled, and "WHEREAS, Schedule H-1 of Part I of the Trustees' intermediate account under Article Seventh of the Will showed undistributed cash income on hand in the amount of $291,059.87 of which $284,600.07 was said to be held in special account for the Third Party, Fourth Party and their half-sister Mahmea E. L. Osborne, and some of the parties hereto have questioned the delay in the allocation and distribution of said income and the continued withholding of part of the same as hereinafter set forth, and "WHEREAS, the First Party has asserted certain personal claims against the Third Party, the Fourth Party and said Mahmea E. L. Osborne, including claims in the amount of [*] 3,542.18.6 against said Eleanor A. Basso and claims against said Frances P. Salmon in the amount of [*] 10,616.14.0, later corrected to [*] 3,866.14.0, as set forth in an affidavit of the First Party and Kenneth Revell Gray, sworn to May 24, 1945 and *65 in connection therewith the First Party instructed the Second Party to withhold certain portions of said undistributed income reported on said Schedule H-1 of the Trustees' account pending satisfactory settlement of such claims, which withheld income on April 14, 1947 consisted of: 100
shares Corn Products Refining Com-
pany, common stock;
200
shares Sterling Drug Inc. common
stock;
100
shares Commercial Investment Trust
Financial Corporation common stock;
100
shares Commercial Credit Com-
pany common stock; allocated to the Third Party, and cash in the amount of $33,602.82 allocated to the Fourth Party, and "WHEREAS, it is the contention of the Third Party and the Fourth Party that said personal claims are without merit, and "WHEREAS, the First Party has asserted personal claims against the estate of said May Peabody Osborne, consisting of debts of [*] 1,303.14.1 listed in his affidavit of April 1, 1937, and a claim of [*] 2,892.12.5 referred to in Schedule D-4 of the Executors' Account, Part I, both later consolidated into a statement of disbursements of [*] 4,969.16.3 listed in his affidavit of August 2, 1945 to the English Account, less *66 credits of [*] 1,922.4.10 listed in said affidavit, leaving a balance of [*] 3,047.11.5 claimed to be due and owing as shown in said affidavit and in Schedule D-4 of the Executors' Account, Part III, and certain of the items constituting said claims have been questioned by some of the parties hereto, and "WHEREAS, said Estate has a claim of [*] 6,042.10.7 against Bovingdon Development Co. Ltd., as shown in Schedule L of Part I of said Accounts, and "WHEREAS, said Bovingdon Development Co. Ltd. is a British corporation, whose principal stockholder is Bovingdon Investment Corporation, a Delaware corporation, all of the shares of which are owned by the First Party by purchase pursuant to order of said Surrogate's Court of New York County dated March 4, 1940, and the assets of Bovingdon Development Co. Ltd. consist of said property at Marlow, known as 'Highfields', the decedent's former home in England, and certain other real property in England, with improvements and appurtenances, and "WHEREAS, it is the contention of some of the parties hereto that said claim has been and is collectible and should have been collected, and "WHEREAS, it is the contention of the First Party *67 that said claim is collectible only in part and the time when any sums can be realized on the underlying assets is doubtful, and "WHEREAS, as shown by the accounts, the First Party, in his capacity as co-Trustee, has received prior to September 24, 1946 income commissions in the amount of $11,796.88 and principal commissions in the amount of $5,156.06, a total of $16,952.94; and as shown by Schedule 'K' of the account of the Executors through April 14, 1944, First Party claimed that there was due him, in his capacity as co-Executor, commissions in the total amount of $28,252.42, and "WHEREAS, it is the contention of some of the parties hereto that certain actions on the part of the First Party in his capacity of co-Executor, co-Trustee and English representative justify his removal from these capacities and the disallowance of the commissions received or claimed by him, * * *
"WHEREAS, after said examination of the First Party pursuant to Section 263 of the Surrogate's Court Act and an investigation and consideration of the facts, the provisions of said decedent's Will and of the law applicable thereto the parties hereto believe that the provisions of said decedent's Will *68 respecting the maintenance of a 'family home' and respecting the duration and extent of the First Party's rights respecting the receipt and use of income under Article Seventh (a) of said Will are susceptible of varying constructions and that it is uncertain what would be the ultimate rulings on the issues hereinabove set forth, and "WHEREAS, each of the parties hereto after due consideration of all the facts and circumstances believe that it will be in the best interests of all of the persons interested in the aforesaid Estate and trusts that any issues which might be raised by the filing of objections with respect to use matters hereinabove set forth be compromised and adjusted so as to avoid the delay and expense of litigation, * * *
"NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is agreed as follows: "FIRST: The First Party agrees to resign and does hereby resign as Executor of and Trustee under the Last Will and Testament of May Peabody Osborne, deceased, and agrees further to withdraw and does hereby withdraw from all connection with said decedent's estate and trusts created under said Will, except as beneficiary under *69 Article Seventh (a) of said Will, to the extent hereinafter mentioned, and except as beneficiary under Article Second, Third and Fourth of said Will, and agrees further, but without limitation of the foregoing, to relinquish completely and irrevocably all power or discretion to allocate income or guide the allocation thereof under Article Seventh (b) of said Will, and all discretion to accelerate or delay the payments of principal to the Third and Fourth Parties and Mahmea E. L. Osborne under Article Seventh (c) of said Will. "SECOND: All of the parties hereto agree that no commissions on income or principal shall be awarded to the First Party, either as Executor of or Trustee under said Will, except the aforesaid income and principal commissions in the total amount of $16,952.94 which were actually paid before September 25, 1946. and shown to have been paid on the Trustees' books by record made prior to that date. "THIRD: All of the parties hereto agree that the personal claims of the First Party against the Estate of May Peabody Osborne in the amount of [*] 2,892.12.5 (adjusted to [3,047.11.5) as shown in Schedule D-4 of the Executors' Account Part III, shall be allowed to *70 him in full satisfaction of all of the claims of the First Party against said Estate, and that said sum of [*] 3,047.11.5 shall be retained by the Second Party and accepted in full payment and satisfaction of the claim of said Estate against Bovingdon Development Co. Ltd. in the face amount of [*] 6,042.10.7, as shown in Schedule L of Part I of said accounts. The parties hereto recognize the doubtful collectibility of said claim against a corporation the assets of which are unliquid and the current balance sheet of which shows a large excess of liabilities over assets, and all of the parties hereto agree to accept such [*$ 3,047.11.5 in full satisfaction thereof, without holding Bovingdon Development Co. Ltd. or the First Party, individually or as English Executor, liable or accountable for the balance. "FOURTH: The First Party agrees to withdraw, release and discharge and does hereby withdraw, release and discharge all claims which he may have or assert against the Third or Fourth Parties or against said Mahmea E. L. Osborne, for moneys claimed to have been advanced on their account to the date of this agreement, including, but without limiting the foregoing, the claims against *71 the Third and Fourth Parties set forth in the affidavit of the First Party and Kenneth Revell Gray of May 24, 1945, and all of the parties hereto agree that all such claims shall be deemed and hereby are fully and finally satisfied and discharged without further consideration or payment thereon, except that the payments of $1,500. to be made to the First Party by each of the Third and Fourth Parties, referred to in Paragraph Eighth hereafter, shall be deemed consideration specifically allocated to the satisfaction of said claims against the Third and Fourth Parties. "FIFTH: All of the parties hereto agree as follows: "The uncertainty and the difference between the parties hereto as to whether said decedent's Will should be construed as entitling the First Party to receive the income, less proper charges, from the fund to produce $25,000. per year, specified in Article Seventh (a), throughout his life, free from any trust or legal obligation to maintain a family home for said decedent's daughters or to make a decision as to whether the maintenance of a family home continued to be desirable or practical, or whether on the other hand said Will should be construed as entitling the *72 First Party to receive said income subject to a duty to maintain such family home and only so long as the First Party should decide the maintenance of such family home to be desirable and practical, shall be resolved as follows: "(a) A fund shall be set aside pursuant to said Article Seventh (a) consisting of the following securities selected from the present holdings in the residuary trust under Article Seventh of the Will * * * "(b) The First Party shall be entitled as long as he shall live to receive the income from said fund, if and to the extent earned, at the rate of Twenty thousand ($20,000.) dollars per annum for the period from April 15, 1947 through April 14, 1950 and at the rate of Fifteen thousand ($15,000.) dollars per annum thereafter. The amounts payable to the First Party as aforesaid shall be computed before deduction of, and shall be subject to deduction of, income commissions with respect thereto at the rates hereinafter set forth, income taxes, if any, to be paid or withheld by the Trustee of said fund with respect to such income and any other charges or expenses properly payable by said Trustee under the terms of said Article Seventh (a) from the income of *73 the fund referred to therein. "The net amounts due to the First Party pursuant to this subparagraph (b) shall be payable, if earned, on the last day of each succeeding June and December. "(c) On the last day of the calendar year 1948 and of each calendar year thereafter any income of said fund in excess of the amount to which the First Party is entitled for such year, pursuant to subparagraph (b), shall be distributed as residuary income under Article Seventh (b) of said Will, except that should the income available for payment to the First Party in any calendar year be less than the amount to which the First Party is entitled for such year, then any excess income in any later year shall be paid to the First Party to the extent necessary to make up such deficit before determining the excess income in such later year to be distributed as such residuary income. * * *
"(e) The First Party shall receive such income for his individual use and benefit free from any duty to maintain a family home, and free from any trust, fiduciary obligation or accountability, provided that during the minority of Mahmea E. L. Osborne he shall maintain a family home for her. A paper filed with *74 the Surrogate's Court, New York County, designated Report of Special Guardian, and purporting to describe the compromise and the facts constituting the background of the controversy, reads in part as follows: "(3) Friction developed between Charles Glidden Osborne and his stepdaughters Eleanor A. Basso and Frances P. Salmon. Both of them left the family home, Highfields, England. Whether their departure was voluntary or under compulsion was the subject of later dispute. The stepfather Charles Glidden Osborne asserted against his two stepdaughters claims for advances, which they denied. The two stepdaughters were not paid any of the considerable income from their residuary trusts. The will had given their stepfather discretionary power to pay such income to Marlow Cottage Hospital, England. Also, in the case of decedent's daughter Eleanor A. Basso she was not paid the one-third share of the principal of her trust due her when she became 27 years of age on February 23, 1944. The will had given her stepfather discretionary power to withhold such principal. "This, then, was the situation when the instant accounting proceeding was instituted in the Fall of 1945. At the time of its institution *75 the stepdaughters Eleanor A. Basso and Frances P. Salmon were adults, married and living away from Highfields. The daughter Mahmea E. L. Osborne was still an infant and resided with her father Charles Glidden Osborne at Highfields, England. United States Trust Company of New York was general guardian of Mahmea's estate and property here. * * *
"At and prior to the institution of this proceeding the relations between the individual executor and trustee, Mr. Osborne, and his stepdaughters Mrs. Basso and Mrs. Salmon were severely strained. The stepdaughters complained of certain items apparent from the accounts and of certain items latent in the situation. Among them were: "(1) They alleged that they had in effect been expelled from the family home at Highfields, England; they complained that the $25,000 a year income given to their stepfather under the will was for the purpose of maintaining a family home for them as well as for him; that he should either advise the corporate cotrustee that maintenance of the family home was no longer desirable or practicable (in which the event he would, under the will, no longer be entitled to his $25,000 a year) or that in any event he should *76 be compelled to accept less than $25,000 per year since the two stepdaughters were no longer maintained there. "(2) They complained that Mr. Osborne had arbitrarily withheld from them the income to which they were entitled under Articles Sixth and Seventh of the will. In each of the three Article Sixth Trusts there had been accumulated approximately $900 of income for each daughter, none of which had been paid them; that in their three residuary trusts there had been accumulated a total of $291,059.87 of income cash, no part of which had been paid them although Schedule L, Pages 38 and 39, indicated that they were entitled to $290,397.68 of such income divisible as follows: "Eleanor A. Basso
$96,799.22
Frances P. Salmon
96,799.23
Mahmea E. L. Osborne
96,799.23 Schedule L of the original account also indicated that of the $21,642.85 income cash on hand in the executor's account (after deduction of a reserve of $7,280.76 for income commissions) no part of such income had been paid them although the three daughters were each entitled to $3,763.88 (see Sch. L, p. 38). "(3) The stepdaughter Mrs. Basso also complained that Mr. Osborne was arbitrarily withholding *77 her one-third share of the principal of her trust which became due her on her twenty-seventh birthday on February 23, 1944. "(4) The stepdaughters complained that Mr. Osborne, despite his refusal to pay them anything, had paid himself $89,003.76 on account of his $100,000 legacy and had paid himself net income of $171,271.78; also that he had taken principal and income commissions in excess of $9,600 and was claiming additional principal and income commissions in excess of $35,500. "(5) That, although as English executor Mr. Osborne had received from himself as New York executor $6,605.26 (cash of $6,543.51 and a security valued at $61.75) and although he was personally claiming [*] 2892.12.5 more from the estate, he had failed and refused to account as English executor. "(6) That he had made unjustified claims against his stepdaughters, [*] 3,542.18.6 against Mrs. Basso and $ 10,616.14.0 (later corrected to [*] 3,866.14.10) against Mrs. Salmon. "(7) That he had personally purchased the family home Highfields, England (by purchase of the Bovingdon stock in proceedings in this Court) at an inadequate value and without actual notice to them although he knew where they were. *78 "(8) That he had failed and refused to collect an estate claim of [*] 6,042.10.7 (appraised at [*] 5,060.12.4, the dollar equivalent of which was, at decedent's death, $25,012.10) against Bovingdon Development Co. Ltd., whose stock he had purchased, although such claim was collectible. "(9) They claimed that he should be removed as executor and trustee and forever shorn of his powers to withhold their income (or even to pay their income to Marlow Cottage Hospital in England) and his powers to delay indefinitely the payments of principal which became due them at specified ages. "(10) While refusing to concede that any securities should be set aside to provide an annual $25,000 income to him, they also disagreed with him as to what securities should be set aside, if any, to provide him with a lesser income now that they had left Highfields. They argued that if a substantial block of Peabody preferred stock was set aside to provide income for Mr. Osborne, even in a reduced annual sum, he would benefit considerably if the heavy cumulative arrears on such stock were paid off, since he would be entitled to all of the income from the securities set aside even if such income exceeded *79 the annual amount to be agreed upon. "These were a few of the problems apparent or latent in the situation when the accounting proceeding was instituted. "Mr. Osborne denied the stepdaughters' charges. He accused them of disobedience to his wishes and of leaving Highfields voluntarily. He pointed out that his own daughter Mahmea E. L. Osborne was still an infant residing with him at the family home, Highfields, and that there was no authority or justification in the will to cut down his annual income simply because the two stepdaughters had left. He claimed that as English executor he had properly expended all the property received from himself and Guaranty Trust Company as New York executors and that the administration of the estate in England had resulted in a deficit which he had personally paid thus giving rise to his personal claim against the estate. "He claimed that the sale to him of the Bovingdon stock in the proceeding instituted in this Court was for an adequate amount and in strict accordance with jurisdictional requirements and with the proprieties; that as to the estate's claim against Bovingdon Development Co. Ltd., such claim was only one of many, including personal *80 claims of his, and that Bovingdon Development Co. Ltd. was hopelessly insolvent. He stated that his claims against the stepdaughters were valid claims for monies advanced on their behalf. He claimed that he had properly exercised the discretion given him under the will to withhold payments to the daughters and that he had an absolute right, if he wished, to give their income to Marlow Cottage Hospital and to withhold payments of principal indefinitely." April 14, 1950, was the anniversary date of the death of May Peabody Osborne next following the date upon which Mahmea became 21 years of age. Opinion Petitioner's wife devised in trust sufficient property to produce an anticipated annual net income of approximately $25,000, such income to be paid to petitioner. The will expressed the desire, although also expressly denying the formation of a trust to that end, that petitioner use such income to maintain a home for himself and/or the decedent's daughters, so long as any of the daughters should so desire. The trust was to terminate upon petitioner's death, or when it was in his judgment no longer desirable or practical to maintain such home. Corpus would then revert to the residuary *81 trust for the benefit of the daughters. Respondent has determined that amounts received by petitioner in accordance with the foregoing testamentary provision were received free of any fiduciary or custodial duty, and were not subject to any condition as to disposition, it being respondent's view that the words of the will respecting a family home were purely precatory. Under this theory, everything received by petitioner thereunder is includible in his gross income, and no deduction of any part thereof may be properly claimed. Petitioner, on the other hand, insists that the foregoing provision constituted him a trustee or other fiduciary, or at least created a condition to his continued receipt of the income of the trust. Under this theory, while petitioner concedes that he is taxable on that part of the receipts expended in maintaining a home for himself, the balance expended on behalf of one or more of the daughters is either not part of his gross income or, in the alternative, deductible therefrom pursuant to section 23(a)(2) of the Internal Revenue Code of 1939. Petitioner claims that $10,000 in each of the first 3 years in issue and $5,000 in each of the latter 3 years is *82 so excludible or deductible. Petitioner's legal arguments require a factual foundation, here that petitioner expended some part of the amounts received other than in the maintenance of a home for himself. Petitioner in fact concedes that to the extent he expended receipts for his own benefit he is taxable thereon irrespective of the meaning of Article SEVENTH of the will (and in the latter 3 years, of the agreement of compromise). He seeks to exclude or deduct only parts of such receipts, alleging that such parts were in fact attributable to maintaining a home for his daughter and available to his stepdaughters through 1946 and for his daughter thereafter. It is elementary that petitioner bears the burden of proving the facts upon which he bases his petition. Here he must prove that he in fact expended a part of the receipts in question for the purpose which he claims, and the amount of such expenditure. This he has failed to do. The record does not show that the cost of maintaining a home for petitioner alone did not at least equal in each year the total amount received under the will and the agreement. We have no evidence before us of petitioner's normal standard of living, *83 and we cannot presume to take judicial notice that it was necessarily more modest than that which prevailed during the period in controversy. Petitioner has, indeed, testified that the cost of maintaining Highfields as a home for himself and the one daughter residing there with him exceeded in each year the amounts received pursuant to the will and, later, the agreement, and that in addition to such receipts, "a good deal" of his capital was expended thereon. It is thus impossible for us to find from the record that the cost of maintaining a home for petitioner alone, commensurate with his usual standards, did not at least equal in each year the receipts in question, and that such receipts were not so expended, any additional expenses because of the three daughters being met by the expenditure of "a good deal" of petitioner's capital. It is equally impossible on this record to attempt ratable allocation as between receipts from the trust and capital for we do not know how much "a good deal of capital" is. Petitioner argues that the agreement of compromise entered into on November 19, 1948, was an arm's length transaction arrived at in settlement of real disputes and that it is *84 therefore an acceptable yardstick for the measurement of detriment to petitioner (and, therefore, the amount he is entitled to exclude or deduct) in maintaining Highfields available to his two stepdaughters and for his daughter, and after the compromise, for his daughter. It is patent that the agreement for compromise which petitioner would have us use as a gauge settled many and various items of dispute which had arisen between petitioner and the other parties thereto. There has been no showing that the parties neatly disposed of each item separately and with no give-or-take as between items in order to finally dispose of the entire controversy. Common sense would indicate the latter to be true. Even if we were disposed to use petitioner's ingenious yardstick, we find that it is of ever-varying lengths because neither the will nor the 1948 agreement purports to give petitioner exact amounts but instead they set aside certain securities and give him the net income therefrom of "approximately $25,000 per annum" under the will and up to a maximum of, first, $20,000 and, later, $15,000 per annum under the said compromise agreement. The amounts actually received by petitioner demonstrate *85 the flexibility of his proffered yardstick. The foregoing failure of proof makes moot petitioner's legal arguments, and we will not treat of them here. Decision will be entered for the respondent.